Jesse L. TALLENT, Dan C. Tallent, and
Billy C. Tallent, Plaintiffs-Respondents,

v.

Hazel Marie BARRETT,
Defendant-Appellant.

No. 11222.

Missouri Court of Appeals,
Southern District,
Division Three.

April 22, 1980.

Motion for Rehearing or to Transfer to
Supreme Court Denied May 9, 1980.

Application to Transfer Denied
June 10, 1980.

Kenneth W. Shrum, Gary A. Kamp, Marble Hill, for plaintiffs-respondents.

Thomas J. Casey, Lewis E. Mallott, Carter & Casey, St. Louis, for defendant-appellant.

TITUS, Presiding Judge.

Three brothers, as plaintiffs, sued their sister Hazel by way of a two-count petition filed March 13, 1978. In Count I, via adverse possession, they sought to quiet title unto themselves to four contiguous tracts of land (311.85 acres). By Count II, an alternative pleading, each plaintiff asserted a $5/18$ th interest in the property by way of inheritance from their parents and a December 5, 1977, conveyance from sisters Glenda and Wilma and claimed they were entitled to a lien on the entire real estate for expenses they had incurred and improvements they had made to the property. The trial court adjudged that "[p]laintiffs have been in the open, notorious, continuous, peaceable, and adverse possession [of three of the tracts (201.85 acres)] in excess of ten years and in fact since late fall, 1950, to the present time." It also found that plaintiffs each owned an undivided $5/18$th interest in the fourth tract (110 acres)[1] and that defend-

---

1. For simplification, our reference to the fourth tract of 110 acres is the same tract denominated as the third tract in the pleadings.

ant Hazel owned an undivided ⅙th interest therein. The trial court additionally ruled the fourth tract was subject to a $37,302.08 lien in favor of plaintiffs for improvements and expenses to be paid them from the proceeds of the sale of that property which the court so ordered.[2] Defendant Hazel appealed.

William and Lillian Tallent had three sons, Jesse, Dan and Billy, the plaintiffs herein, and three daughters, Glenda, Wilma and Hazel, the latter being the defendant herein. William was the sole title owner of the three tracts of farmland consisting of 201.85 acres, while he and Lillian, as tenants by the entirety, owned the fourth 110 acre tract. The four tracts were used as one farm and the residence of the family. William died intestate in 1950. His estate was not administered and Lillian's dower was never assigned nor did she ever make a statutory election. The widow Lillian and the plaintiffs continued living on and farming the four tracts for 19 years after William's death or until Lillian died intestate in 1969. The three girls, all married, had not resided on the property after their father's death and, after widow Lillian died, the plaintiffs continued in possession of the four tracts, farming, living on and generally using them as their own property.

After father William's demise in 1950, to and including the date of trial of this cause (June 26, 1978), plaintiffs paid all of the taxes, expenses and insurance on the property, paid for all improvements thereon and pocketed 100% of all the income derived from farming and operating the property. The three sisters, including defendant, contributed nothing to the payment of taxes or expenses incurred in maintaining, operating and improving the four-tract farm; neither did they share in the income and profits realized from the farm's operations.

Regarding the ultimate ownership of the four tracts in question after William's death in 1950, plaintiffs Billy and Jesse and sister Glenda testified that following William's funeral some of the six children were in the kitchen at the homeplace and a discussion was had among those present. Whether or not defendant Hazel was present and participated could not be remembered by two of the three siblings who testified for plaintiffs. Defendant Hazel denied any participation. In substance, the testimony of the two plaintiffs and sister Glenda was that the discussion culminated in an "understanding" that if the plaintiffs lived on the tracts, operated them and cared for their mother, the farm would belong to the plaintiffs after the mother died. According to the evidence, this was the one and only time the subject was ever discussed.

In December 1977, three months before this action was commenced, sisters Glenda and Wilma, via a general warranty deed, conveyed their interests in the four tracts to plaintiffs. Defendant Hazel's name had been typed on the deed in several places as one of the grantors but had been crossed out at some unknown time and there was no evidence that she had been approached and asked to sign it. In the body of the deed were recitations stating that the grantors and grantees named therein were the six children of William and Lillian Tallent, which would have included defendant Hazel. Trial testimony showed that after execution and delivery of the deed, plaintiffs gave sisters Glenda and Wilma $4,000 each. However, plaintiff Jesse and sister Glenda indicated these payments were not mandatorily made on account of the conveyance.[3]

2. Actually each plaintiff was declared liable for ⁵⁄₁₈ths or $10,616.50 of the improvements, while defendant Hazel was declared liable for ⅙th or $6,216.99 of the improvements. In this appeal defendant Hazel makes no complaint concerning that portion of the judgment relating to the fourth tract originally owned by William and Lillian Tallent as tenants by the entirety, nor the fact plaintiffs had all the prof-

its therefrom since 1950 without accountability to the others.

3. There was testimony by defendant Hazel's daughter that in 1977, before the warranty deed was signed by Glenda and Wilma, defendant Hazel had been offered $1,200 by plaintiffs for a similar deed. Obviously such an offer, if so, had been refused. Albeit such an offer of purchase will not divest title actually vested at

■ It is imperative to note there is not a shred of evidence indicating that the widow Lillian acquiesced in or agreed to the purported understanding had by the children as to the ultimate ownership of the property. Furthermore, there was no suggestion whatsoever that the widow, willingly or otherwise, ever conveyed, abandoned or was in any manner shorn of her rights in the property. Because of this, and the fact that the evidence demonstrates the tracts, including the one solely owned by the widow after her husband's death, were used together as one farm on which the dwelling house was situate, "under the law the widow's quarantine right of occupation and use would [at a minimum] cover [these] tract[s] until such time as dower and homestead were assigned or extinguished." *Moore v. Hoffman*, 327 Mo. 852, 859[2], 39 S.W.2d 339, 341[1] (1931); Ch. 469 RSMo 1949. However, the point here is that there was a period of time, after William's death in 1950, during which defendant Hazel's title in and to the three tracts that had been wholly owned by William did not mature and during that time it was not possible for plaintiffs to hold possession adversely to her. *Pahler v. Schoenhals*, 234 S.W.2d 581, 582–583[5] (Mo.1950). Moreover, and where, as here, plaintiffs (as partial heirs to the three tracts owned solely by their father) resided on the property with their mother Lillian without assignment of dower or homestead to her, plaintiffs' possession was not hostile to Lillian's rights as the surviving wife of the deceased William. 2 C.J.S. Adverse Possession § 136, p. 845. Consequently, the trial court's adjudication that plaintiffs have been in "open, notorious, continuous, peaceable and adverse possession" of the three tracts consisting of 201.85 acres "since late fall, 1950, to the present time" was erroneous.

■ At the time father William died intestate, title to the property solely owned by him passed in equal shares to the six children subject to his widow's rights as just noted. The general rule is that such heirs, as tenants in common, who do go into possession of the real estate, do not do so adversely to the others but hold the property for the other cotenants or coheirs not in actual possession. *Replogle v. Replogle*, 350 S.W.2d 735, 738 (Mo.1961); 3 Am.Jur.2d, Adverse Possession, § 233, at 331. Also, if the possession of those in residence is permissive at its inception, then their possession, no matter how long it continues, will not divest the other heirs of their titles unless such possession becomes hostile and such hostility is effectively brought home to all the owners and remains so for the necessary statutory period of time. *Higgerson v. Higgerson*, 494 S.W.2d 374, 378[4] (Mo.App. 1973). Furthermore, possession by part of the tenants in common under an agreement or via an understanding that, upon fulfillment of such understanding at some future unknown time, the cotenants not in possession will convey their interests to those in possession or that those in possession will then assume title is not a hostile holding until the future contingency ripens. Cf. *Zimmerman v. Newport*, 416 P.2d 622, 629–630[4, 5] (Okl.1966); *Triplett v. Chadwick*, 311 S.W.2d 554, 555 (Ky.1958); *White v. Smith*, 265 S.W.2d 937, 938[2] (Ky.1954); *Mills' Adm'x v. Mills*, 265 S.W.2d 458, 460[3] (Ky.1954); 3 Am.Jur.2d, Adverse Possession, § 36, pp. 121–122. The mere payment of taxes vel non does not create title or divest title [*Slentz v. Cherokee Enterprises, Inc.*, 529 S.W.2d 495, 499[5] (Mo.App.1975)] for every possession is presumed rightful and consistent with title, rather than in opposition or adverse to title and ownership. *Russell v. Russell*, 540 S.W.2d 626, 632[7] (Mo.App.1976).

■ At first blush it appears incongruous that the trial court should conclude, contrary to plaintiffs' claim in Count I of their petition, that plaintiffs had not, via adverse possession, acquired title to the fourth tract first titled in William and Lillian by the entirety when plaintiffs' claim of

a previous time, it may, nevertheless, be considered in determining the character of the possession during the statutory period. *Harp v.*

*Christian*, 215 Ark. 833, 223 S.W.2d 778, 779[2] (1949).

adverse possession as against Lillian covered the same period attributable to the other three tracts originally owned by William alone. However, as the surviving tenant by the entirety of the fourth tract (110 acres), Lillian became its sole owner when William died in 1950. Thereafter, Lillian and the plaintiffs were jointly in possession of this property, as well as the other three tracts, until Lillian died in 1969. The supposed incongruity is explained away by the simple fact that to be adverse, possession must be exclusive. The rightful owner cannot be deprived of title by possession of another if he is also in possession with the adverse claimant as joint possession is not adverse. *Fiorella v. Jones*, 259 S.W. 782, 785[6] (Mo. 1923); 2 C.J.S. Adverse Possession § 55, at 728. Since this action was commenced and determined before ten years had expired following Lillian's demise, the trial court was correct in holding that plaintiffs had not acquired title by adverse possession to the 110 acre tract formerly titled in William and Lillian by the entirety.

 As to the three tracts originally owned by William alone and declared by the trial court to belong to plaintiffs via adverse possession, it must be remembered that the five fundamental elements necessary to constitute effective adverse possession are (1) the possession must be hostile and under a claim of right, (2) it must be actual, (3) it must be open and notorious, (4) it must be exclusive and (5) it must be continuous. Note the elements are stated in the conjunctive, and the lack of any one element (particularly hostile) defeats the claim of adversity. Adverse possession implies a commencement wrongfully by ouster or disseisin and maintained against right. The law presumes that every possession is consistent with title and not adverse thereto. To rebut this presumption, the party championing adverse possession must show either actual knowledge of the real owner that the adverse claimant is claiming in defiance and opposition of the real owner's title or a use and occupancy by adverse claimant so notorious and open and inconsistent with and injurious to the rights of the true owner that, from such facts, the

law will authorize a presumption of such knowledge reposing in the true owner. *Hilgert v. Werner*, 346 Mo. 1171, 1176, 145 S.W.2d 359, 361[2–4] (1940). Permissive possession is not adverse possession and if possession in its inception is permissive, it so remains until the hostile claim is brought home to the true owner and thereafter continues for such time as will satisfy the statutory requirements in time. *Eld v. Ellis*, 235 S.W.2d 273, 275–276[2] (Mo.1950). The general rule is that permissive occupation of a family estate by one or more, but not all, members of the family is so usual and common that acts of occupation thereof to show hostile adverse possession against one another, must be demonstrated by a clear, positive and continued disclaimer and disavowal of title and an unadulterated assertion of adverse right brought home to the true owners for such time as to bar them, by statutory limitations, from asserting their rights. Where there exists a family relationship among the involved parties, that relationship will prevent or rebut a presumption of adverse holding that may arise under similar circumstances involving nonrelated parties. Stronger evidence of adverse possession is required in the presence of a family relationship than where no such relationship exists. 3 Am.Jur.2d, Adverse Possession, §§ 49 and 147, pp. 139 and 229.

 As already observed, plaintiffs' occupancy of the farm was pursuant to an "understanding" had among some of the children on the day their father William was buried in 1950. So plaintiffs' evidence revealed, the "understanding" was that if plaintiffs operated the farm and cared for their mother, Lillian, the farm would belong to plaintiffs at some unknown time in futuro when Lillian died, an event which did not occur until 1969. This so-called "understanding" was discussed but the one time and plaintiffs did not assert to defendant Hazel, "until just recently", that they were claiming the farm solely as their own because the subject "never did come up." Based on plaintiffs' own evidence, their possession of the farm from 1950 until their

mother died in 1969 was pursuant to the "understanding" and was, at least in its inception, permissive and not hostile. By reason of the "understanding" there was no showing that plaintiffs' occupancy was inconsistent with and injurious to the rights of the other children and, as the matter "never did come up", the evidence was wholly void of demonstrating that defendant Hazel possessed actual knowledge that plaintiffs were claiming the farm in defiance and opposition to the true title.

With caution and a firm belief, we conclude that the portion of the judgment nisi holding plaintiffs, via adverse possession, to be the owners of the three tracts originally owned solely by William is wrong, because there was no substantial evidence to support it, because it is against the weight of the evidence and erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo.banc 1976).

In plaintiffs' brief, they urge dismissal of defendant's appeal for her failure to comply with the requirements of Supreme Court Rule 84.04(d), V.A.M.R. The urging is well taken. Nonetheless, as we, as above determined, are of a mind the judgment below was, in part, in error, the entreatings are denied.

The judgment below is affirmed as it relates to the tract formerly owned by William and Lillian as tenants by the entirety, and is reversed and remanded as it concerns the three tracts previously and solely owned by William for further proceedings as may be necessary, on present or amended pleadings, to determine the scope of the relief to which the parties may be entitled.

All concur.